1
2
3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

4
5
6
7
8
9

TIMAERO IRELAND LIMITED,

               Plaintiff,

    v.

THE BOEING COMPANY,

               Defendant.

CASE NO. C21-488 RSM

ORDER GRANTING IN PART
DEFENDANT'S MOTION TO DISMISS

10
11

## I.      INTRODUCTION

12
13
14
15
16
17

This matter is before the Court on Defendant Boeing's Motion to Partially Dismiss Timaero's Second Amended Complaint, Dkt. #120.  Boeing seeks to dismiss Count I (fraud), Count II (negligent misrepresentation), Count III (product liability), and Count V (unjust enrichment), leaving Count IV (breach of contract) unchallenged.  Plaintiff Timaero Ireland Limited ("Timaero") opposes.  Dkt. # 124.  The Court has determined that it can rule without needing oral argument.  For the reasons stated below, the Court denies this Motion in part and grants it in part without further leave to amend.

18

## II.      BACKGROUND

19
20
21
22
23
24

This lawsuit arose after Plaintiff Timaero agreed to purchase twenty-two 737 MAX airplanes from Boeing.  The parties partially performed their agreement, with Timaero making a $189,224,800 deposit and Boeing delivering two airplanes. Before more planes could be delivered, two 737 MAXs crashed from the sky, tragically claiming 346 lives. The crashes resulted in the worldwide grounding of all 737 MAXs and subsequent investigations pointed to

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS – 1

1   Boeing's inclusion of a Maneuvering Characteristics Augmentation System ("MCAS") as a

2   significant cause of the crashes. Scrutiny also revealed that Boeing concealed MCAS's true

3   operation from the Federal Aviation Administration ("FAA") so that the FAA would certify the

4   737 MAX without requiring pilots to undergo costly flight simulator training, a selling point in

5   Boeing's marketing of the 737 MAX.

6        As Boeing's conduct came to light, Timaero sued Boeing in the United States District

7   Court for the Northern District of Illinois, seeking to recover its deposit and additional claimed

8   damages. Timaero alleged that Boeing had acted fraudulently, had breached the parties' contract,

9   and had breached the duty of good faith and fair dealing. Boeing sought to have part of Timaero's

10  complaint dismissed and to have the case transferred to the Western District of Washington. The

11  Honorable Rebecca R. Pallmeyer, United States District Court Judge, agreed with Boeing,

12  dismissing Timaero's fraud and duty of good faith and fair dealing claims and transferring the

13  case to this Court.  Dkt. #82.

14       This Court granted Timaero leave to amend its complaint.  Dkt. #114.  The Second

15  Amended Complaint alleges the following causes of action:

16       I.   Fraud;

17       II.  Negligent Misrepresentation;

18       III. Product Liability under the Washington Product Liability Act;

19       IV.  Breach of Contract;

20       V.   Unjust Enrichment.

21  Dkt. #117.

22       For purposes of this Partial Motion to Dismiss, the Court will accept all facts in the Second

23  Amended Complaint as true.  The Court will briefly summarize the allegations.

24

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS – 2

1    Plaintiff Timaero is an Irish private company with a principal place of business in Dublin,

2    Ireland.   Timaero is not an airline, but rather a "financial organization in the business of

3    purchasing aircraft and leasing/selling them for profit." Dkt. #117 at 4.  Boeing is an aerospace

4    company involved in the design, manufacture, and sale of commercial aircraft.  The Purchase

5    Agreement entered into by the parties provides that it is to be interpreted and governed under the

6    laws of the State of Washington.

7    In August of 2011, Boeing's Board of Directors authorized the launch of a new iteration

8    of 737 aircraft to compete with the Airbus A320 NEO—the "MAX" Series.  Boeing purposely

9    chose to redesign a 737 rather than build an entirely new aircraft to expedite the regulatory

10   approval process by using an "amended type certificate." The FAA grants amended type

11   certificates to modifications of previously approved aircraft. Boeing knew that if the 737 MAX

12   was certified through an amendment of the 737's 55-year-old type certificate, then Boeing could

13   get approval in six years, instead of the ten required for a new design, and it would be cheaper

14   than designing a new plane from scratch.

15   The pleading describes in great detail the development of the 737 MAX, with many twists

16   and turns.  Not all of these allegations are relevant for purposes of ruling on this partial motion to

17   dismiss, and many of them serve only to add additional layers of support to Timaero's claims.

18   Because Plaintiff's claims largely survive this Motion, the Court will not recite all of these facts

19   at this stage.

20   Boeing met several times with Timaero representatives to market and sell the 737 MAX.

21   On June 19, 2013, Ray Conner (President and CEO of Boeing Commercial Airplanes) and

22   Vyacheslav Soloviev (on behalf of Timaero) entered into a letter of intent to purchase twenty 737

23   MAX aircraft.  The parties then began negotiating the terms of the Purchase Agreement.

24

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS – 3

On August 12, 2013, Mr. Basyuk and Jorge Molina Acosta (Boeing Regional Marketing Director) met in Moscow with Mr. Soloviev and Mr. Vasyukov from Timaero. Mr. Acosta specifically flew from Seattle to give Timaero a presentation on the 737 MAX and discuss Boeing's sale proposal. On August 19, 2013, Mr. Basyuk gave a presentation on the 737 MAX to Timaero representatives in Moscow. On September 12, 2013, Mr. Basyuk met again in Moscow with Mr. Soloviev and Mr. Vasyukov, to further discuss the 737 MAX. On November 10-14, 2013, Timaero representative Igor Komlev met with Boeing representatives, including George Peppes (Boeing Regional Marketing Director), in Muscat, Oman regarding the 737 MAX. On November 21, 2013, Boeing representatives, including Mr. Acosta, Jordan Weltman, Mher Papyan, Tim Myers, Anastasia Ivanischeva, and Richard Hammond, met in Moscow with Timaero representatives, Igor Komlev and Ivan Vasyukov, relating to the 737 MAX.

Boeing represented—including during the above-referenced meetings with Timaero representatives—that the 737 MAX would not require additional simulator training for pilots already certified to fly its predecessor 737 NG (Level B non-simulator pilot training requirements), and would be airworthy, safe, free from design defects, and in compliance with appropriate aviation regulations. Timaero alleges it relied on each of these representations in deciding whether to purchase any 737 MAX aircraft.  Timaero alleges it would not have purchased any 737 MAX aircraft, executed the Purchase Agreement, executed the Supplemental Agreements, or accepted delivery of any aircraft had Boeing disclosed the MCAS information in Boeing's possession and control.

On January 10, 2014, Boeing and Timaero entered into Purchase Agreement Number PA-04022 ("Purchase Agreement") for the purchase and sale of twenty Boeing 737 MAX aircraft. The Purchase Agreement incorporated the terms and conditions of the Aircraft General Terms

1    Agreement dated January 10, 2014, identified as VEB-AGTA.  The Purchase Agreement also

2    incorporates numerous letter agreements, tables, exhibits, and the Supplemental Agreements.

3          The Purchase Agreement provides in relevant part that "Boeing will manufacture each

4    aircraft to conform to the appropriate Type Certificate issued by the United States Federal

5    Aviation Administration (FAA) for the specific model of aircraft and will obtain from the FAA

6    and furnish to Customer at Delivery of each aircraft either a Standard Airworthiness Certificate

7    or an Export Certificate of Airworthiness issued pursuant to Part 21 of the Federal Aviation

8    Regulations."

9          Boeing and Timaero expressly contracted that no additional simulator training would be

10   required for 737 NG pilots.  Boeing did not disclose key details about the novelty of the MCAS

11   system on the 737 MAX.

12         After signing the Purchase Agreement and through 2014, Boeing continued to make the

13   same representations (or misrepresentations) about these issues at meetings in Moscow and in

14   Boeing's Seattle facilities.

15         In 2016, Boeing altered the MCAS system to expand when it would be activated beyond

16   designs originally offered to the FAA.  These changes were not communicated to Timaero. For

17   example, by at least March 30, 2016, Boeing completed MCAS "Revision D," which changed the

18   parameters under which MCAS would activate to include the much slower airspeeds. Exhibit 3

19   at 20-21. It also increased the maximum range of MCAS from 0.55-degrees to 2.5-degrees, an

20   increase of over 300 percent.

21         Timaero pleads "Upon information and belief, the information that led to the decision to

22   design and implement Revision D was known to Boeing prior to and/or near in time to Timaero's

23   execution of the Purchase Agreement following testing and analyses conducted during

24   approximately 2012-2014 and following software developments during 2015."  *Id*. at 47.  Many

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS – 5

further details are pleaded as to the flaws with the revised MCAS system, none of which are necessary to discuss for purposes of this Order.

On September 15, 2016, Timaero and Boeing entered Supplemental Agreement No. 1, wherein the parties agreed to convert two (2) Boeing 737-800 aircraft from a prior purchase agreement into two (2) Boeing 737 MAX aircraft. This was an amendment to the Purchase Agreement.

Timaero pleads that Boeing actively concealed MCAS's expanded use from regulators and customers, including Timaero.

On or about November 15, 2016, during a test flight of the 737 MAX in a simulator, Boeing's Chief Technical Pilot, Mark Forkner, experienced the MCAS operating at lower speed and wrote in an internal Boeing chat:

> Mr. Forkner: Oh shocker alerT! [sic] / MCAS is now active down to [Mach] .2 / It's running rampant in the sim on me / at least that's what [a Boeing simulator engineer] thinks is happening
>
> Mr. Gustavsson: Oh great, that means we have to update the speed trim description in vol 2
>
> Mr. Forkner: so I basically lied to the regulators (unknowingly)
>
> Mr. Gustavsson: it wasn't a lie, no one told us that was the case.

*Id*. at 63. Boeing never updated the FAA and failed to inform the FAA or Timaero of the significant changes to MCAS. This is explained in further detail in the pleading.

On or about July 5, 2017, the FAA AEG published the first 737 MAX FSB Report, which included the FAA AEG's "Level B" differences-training determination for the 737 MAX. Because of Boeing's intentional withholding of information from the FAA AEG, the final version of the 737 MAX FSB Report lacked information about MCAS, and relevant portions of this 737 MAX FSB Report were materially false, inaccurate, and incomplete.

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS – 6

As required by contract, Boeing supplied Timaero with a Detail Specification, representing that the 100-plus page Detail Specification constituted a detailed and accurate technical description of the Aircraft and its systems. However, the Detail Specifications failed to mention the existence of MCAS. Boeing's standard Detail Specification was also scrubbed; early versions of it apparently listed MCAS in the table of acronyms but did not use the term anywhere else. The versions of the Detail Specification provided to Timaero did not mention MCAS in the acronym list.

From August 28, 2017, to September 28, 2018, Timaero and Boeing entered into six Supplemental Agreements amending certain terms of the Purchase Agreement.  Timaero paid for and accepted its first two 737 MAX aircraft under the Purchase Agreement in December 2018. Both of these aircraft were continuously operated by EASTAR JET out of Seoul, Korea before the 737 MAX was grounded.

On October 29, 2018, Lion Air Flight 610, a Boeing 737 MAX, crashed shortly after takeoff into the Java Sea near Indonesia. All 189 passengers and crew perished.

On March 10, 2019, Ethiopian Airlines Flight 302, a Boeing 737 MAX, crashed shortly after takeoff near Ejere, Ethiopia. All 157 passengers and crew perished.

On March 13, 2019, the 737 MAX was officially grounded in the United States, indefinitely halting further flights of this airplane by any U.S.-based airline.  Eventually all 737 MAX aircraft were grounded worldwide.  Both the Lion Air and Ethiopian Airlines flights were a result of MCAS malfunction.

As the grounding dragged on, Boeing repeatedly promised a fix just around the corner, but was unable to deliver for nearly twenty months.  This damaged Timaero in a variety of ways that are not at issue in this Motion.

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS – 7

1

### III.   DISCUSSION

2

**A.  Legal Standard under Rule 12(b)(6)**

3      In making a 12(b)(6) assessment, the court accepts all facts alleged in the complaint as

4 true, and makes all inferences in the light most favorable to the non-moving party.  *Baker v.*

5 *Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (internal citations omitted).

6 However, the court is not required to accept as true a "legal conclusion couched as a factual

7 allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

8 U.S. 544, 555 (2007)).  The complaint "must contain sufficient factual matter, accepted as true,

9 to state a claim to relief that is plausible on its face." *Id.* at 678.  This requirement is met when

10 the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the

11 defendant is liable for the misconduct alleged." *Id.*  The complaint need not include detailed

12 allegations, but it must have "more than labels and conclusions, and a formulaic recitation of the

13 elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Absent facial plausibility,

14 a plaintiff's claims must be dismissed. *Id.* at 570.

15      Where a complaint is dismissed for failure to state a claim, "leave to amend should be

16 granted unless the court determines that the allegation of other facts consistent with the challenged

17 pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture*

18 *Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

19

**B.  Fraud and Misrepresentation Claims**

20      As an initial matter, Boeing argues that these two claims (and just these two claims) should

21 be governed by Illinois law.  Dkt. #120 at 12.  Boeing states that Timaero received unfavorable

22 rulings in the Northern District of Illinois (the transferring court) after briefing these claims under

23 Illinois law, and is engaging in "impermissible gamesmanship" by trying to apply Washington

24

1    law now.  *Id.* (citing *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014);

2    *Lott v. Levitt*, 556 F.3d 564, 567–68 (7th Cir. 2009)).

3          Boeing is the party that moved for transfer to this District.  *See* Dkt. #33.  Boeing argued

4    that its contracts with Timaero call for the application of Washington law and that "the individuals

5    who negotiated and executed them for both parties are located either in Washington or overseas."

6    *Id.* at 1–2.  The record does not support the conclusion that Timaero is engaging in gamesmanship.

7    This case is at an early stage, unlike in *McCoy* and *Lott*.  Boeing cites no controlling case law

8    requiring this Court to apply the law of the transferring court to these claims.  Such would serve

9    little practical purpose.  The Court will be applying Washington law to the contractual claims and

10   the WPLA claim.   Further, parallel 737 MAX cases (cited by Boeing) apply Washington law for

11   similar fraud and misrepresentation claims.  The Court sees no reason to apply Illinois law and

12   will not do so on purely procedural grounds.  Washington law will govern these claims.

13         To state a claim for fraud, Timaero must, *inter alia*, allege that Boeing had "knowledge

14   of falsity" when it made the alleged misrepresentations on which Timaero relied.  *See, e.g., Elcon*

15   *Constr., Inc. v. E. Wash. Univ.*, 273 P.3d 965, 970 (Wash. 2012).

16         Fraud has certainly been alleged by others against Boeing concerning the 737 MAX, and

17   such claims have survived similar motions to dismiss.  The main issue with Timaero is timing.

18   Boeing states that its "alleged pre-contract representations came too early in the MAX's

19   development and are too general to support a claim for relief."  Dkt. #120 at 13.

20         According to the pleadings, Boeing and Timaero executed the initial Purchase Agreement

21   for the sale of twenty 737 MAX aircraft on January 10, 2014. Subsequently, Boeing and Timaero

22   executed seven Supplemental Agreements between September 2016 and November 2018, with

23   each of these Supplemental Agreements providing that "[t]he Purchase Agreement is amended as

24   set forth above, and all other terms and conditions of the Purchase Agreement remain unchanged

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS – 9

and are in full force and effect." Timaero alleges that Boeing continued to intentionally withhold information regarding MCAS throughout this time period, and argues that the result should be the same here as it was in *Smartwings, A.S. v. Boeing Co.*, No. C21-918 RSM, 2022 U.S. Dist. LEXIS 33640 (W.D. Wash. Feb. 25, 2022).  Dkt. #124 at 13–14.

The Court will first address the argument that the fraud and misrepresentation allegations are "too general."  Accepting all facts alleged in the complaint as true, and with all inferences in the light most favorable to the non-moving party, Timaero easily satisfies the above standard and Rule 9(b) with the detailed allegations included in the Amended Complaint.  Boeing allegedly made many knowingly false statements about the 737 MAX to Timaero directly over several sales presentations, including that these planes would require no new simulator training and that Boeing would provide all materials and information necessary to safely operate the aircraft.  The falsity of these statements is tied up with Boeing's alleged intentional regulatory subterfuge and could plausibly be proven at trial.  Given the findings of other investigative bodies, Boeing's fraudulent misrepresentation to Timaero is entirely plausible.  If Boeing wants to pin down each and every statement it did or did not make to Timaero over multiple presentations, it is free to do so at the summary judgment stage or at trial.  Timaero adequately pleads knowledge of falsity.

As to timing, the Court is satisfied that at least some of the supplemental agreements occurred after Boeing allegedly had sufficient knowledge to engage in fraud or make material misrepresentations to Timaero. This is sufficient for these claims to survive the motion to dismiss stage, and the Court will not get drawn into the weeds identifying now what facts may be presented at trial or what damages are available.

### C.  WPLA Claim

The Washington Product Liability Act ("WPLA") provides a cause of action for harm caused by products that are not designed, constructed, or labeled in a reasonably safe manner.

RCW § 7.72.030. A plaintiff may bring a product liability claim under the WPLA against the manufacturer for harm caused by a product.  RCW § 7.72.010(4). "Harm" for purposes of the statute "does not include direct or consequential economic loss." RCW § 7.72.010(6). "The WPLA explicitly confines recovery to physical harm suffered by persons and property and leaves purely economic loss to [contract law]." *Hofstee v. Dow*, 109 Wn. App. 537, 543, 36 P.3d 1073 (2001) (citing RCW § 7.72.010(6); *Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wn.2d 334, 351, 831 P.2d 724 (1992)); *see also Wash. Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 857-60, 774 P.2d 1199 (1989).  Washington courts refer to this as the WPLA's "economic loss" exclusion. *Touchet Valley Grain Growers, Inc.*, 119 Wn.2d at 351.

Boeing argues "Timaero's claim for product liability under the [WPLA] fails for the same reasons that this Court rejected indistinguishable claims brought by other 737 MAX customers." Dkt. #120 at 22. Boeing cites to *Wilmington Tr. Co. v. Boeing Co.*, 2021 WL 754030, at *7 (W.D. Wash. Feb. 26, 2021), which stated that the WPLA "focuses on the harm suffered by the plaintiff" and rejected harm stemming from the experiences of other 737 MAX customers. *Id.* at 24.  The Court agrees with its prior analysis from *Wilmington Trust* and finds that the factual record here is sufficiently analogous.  Timaero's harms are contractual in nature, Plaintiff is barred by the economic loss rule from pursuing this claim, and has otherwise not plausibly pled this claim under a "risk of harm" analysis.  Dismissal is warranted under Rule 12(b)(6).  Leave to amend will not be granted as Timaero has amended twice before.

### D.  Unjust Enrichment Claim

Boeing moves to dismiss this claim as eclipsed by Timaero's contract claim.  Timaero disagrees and maintains that it can plead this in the alternative or that it should be allowed to amend to add a quantum meruit claim. Dkt. #124 at 28–29.  On Reply, Boeing states:

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS – 11

1

2

3

4

5

6

7

8

9

10

11

   In any case, neither unjust enrichment nor quantum meruit can survive dismissal because there is a valid express contract between Boeing and Timaero, and the parties do not dispute the validity of that contract. Washington law is clear that where, as here, a valid express contract exists, a plaintiff cannot sue on an implied contract related to the same subject matter. *Chandler v. Wash. Toll Bridge Auth.*, 137 P.2d 97, 103 (Wash. 1943). Timaero's own authorities say as much. *See Scott v. Carr*, 2020 WL 6381812, at *5 (W.D. Wash. Oct. 30, 2020) (declining to dismiss unjust enrichment claim because "the validity of the contract remains in dispute"); *Vernon v. Qwest Commc'ns Int'l*, 643 F. Supp. 2d 1256, 1267 (W.D. Wash. 2009) ("A claim for unjust enrichment may survive a motion to dismiss if a plaintiff challenges the validity of the contract."); *Northwood Est., LLC v. Lennar Nw., Inc.*, 2020 WL 1033579, at *8 (Wash. Ct. App. Mar. 3, 2020) ("Unjust enrichment and quantum meruit are used … where there is no contract governing the parties' relationship."). Simply put, "neither remedy is available if the claim is covered by the terms of a contract." *Northwood Est.*, 2020 WL 1033579, at *8; *see also Boyd v. Sunflower Props., LLC*, 389 P.3d 626, 633 (Wash. Ct. App. 2016) (implied contracts "do not exist to circumvent written agreements").

12

13

14

15

   Boeing's points are well-founded.  Timaero is not arguing (and there is no plausible basis for the Court to find) that a contract did not exist between the parties resulting in the alleged benefit obtained by Boeing, *i.e.* the payment for the planes.  Given this, it is not possible to plead either unjust enrichment or quantum meruit in the alternative.  This claim is properly dismissed.

16

## IV.  CONCLUSION

17

18

19

20

   Having reviewed the relevant pleadings and the remainder of the record, the Court hereby finds and ORDERS that Defendant Boeing's Motion to Dismiss, Dkt. #120, is GRANTED IN PART AND DENIED IN PART as stated above.  Plaintiff's third and fifth causes of action are dismissed without leave to amend. The remaining claims are not dismissed.

21

   DATED this 12th day of May, 2023.

22

23

24

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS – 12